IN THE UNITED STATES COURT
FOR THE DISTRICT OF PUERTO RICO

JOSÉ SANTIAGO INC.,

Plaintiff,

v.                                      CIV. NO. 22-1239 (SCC)

SMITHFIELD FOODS, INC.,
SMITHFIELD PACKAGED MEATS
CORP., AND ABC INS. CO.,

Defendant.

## OPINION AND ORDER

José Santiago Inc. (JSI) seeks a preliminary injunction ordering Smithfield[1] to continue their unwritten, nonexclusive distribution contract. But the parties' interests and public policy weigh against issuing one. We therefore deny JSI's motion for a preliminary injunction. Our explanation follows.

---

1. Initially, JSI filed suit against only Smithfield Foods, Inc. Smithfield Packaged Meats Corp. then entered this case and said that it would defend against JSI's motion for a preliminary injunction because it, rather than Smithfield Foods, Inc., its parent company, is the proper defendant. The parties have not yet agreed which entity is the proper defendant. Because we are denying JSI's motion, we see no need to resolve this dispute now. We will refer to Smithfield Foods, Inc., and Smithfield Packaged Meats Corp. collectively as "Smithfield."

## I.   Factual Background

Puerto Rico's Dealer's Contracts Act ("Law 75"), P.R. Laws Ann. tit. 10, §§ 278–278e, prohibits principals or suppliers from impairing their contracts with dealers or distributors without just cause. JSI argues that it is a dealer under Law 75, it has a nonexclusive distribution contract with Smithfield, and Smithfield has no just cause to stop supplying it with products on June 15, 2022. JSI seeks a preliminary injunction ordering Smithfield to continue their contract. On June 10th, we held a hearing and received evidence. We draw the following facts from the evidence presented there. All our findings and conclusions are tentative—not binding—and best understood as "statements as to probable outcomes." *Campbell Soup Co. v. Giles*, 47 F.3d 467, 472 (1st Cir. 1995) (quoting *Aoude v. Mobil Oil Corp.*, 862 F.2d 890, 894 (1st Cir. 1988)). For a party who loses the battle here may nonetheless win the war at trial. *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991).

In 1995, Farmland Foods, Inc. ("Farmland"), and JSI entered into an exclusive distribution contract. Farmland later merged into an entity within Smithfield Foods, Inc.'s corporate umbrella. But JSI remained the exclusive distributor for Farmland products. In October 2019, Smithfield met with JSI to discuss its upcoming brand consolidation. In this meeting, Smithfield informed JSI that it would continue to be its exclusive distributor for Farmland products. Smithfield later said that it had meant that JSI would remain the exclusive distributor for Farmland products for as long as those products exist and that it did not promise JSI exclusive rights to the new Smithfield brand. JSI disagrees, insisting that Smithfield promised JSI that it would be the exclusive distributor for any Smithfield products resulting from consolidating the Farmland brand.

Though JSI is the exclusive distributor for Farmland products, before Smithfield's brand consolidation, another entity in Puerto Rico distributed Smithfield brands. Ballester Hermanos, Inc. (BHI), distributed John Morrell products,

among others. Smithfield says that it did not offer either of them exclusive rights to its new Smithfield brand but instead offered each one a portfolio of exclusive Smithfield products.

In May 2020, Smithfield sent its distributors, including JSI, a formal notice that it would be reducing its brand offerings and that Farmland would be consolidated into the Smithfield brand. JSI then sent Smithfield a letter asking for clarification because the notice contradicted its understanding of Smithfield's brand consolidation process. Smithfield requested a meeting. At the meeting, Smithfield informed JSI that it intended for both JSI and BHI to distribute Smithfield brand products. Afterwards, JSI sent Smithfield a cease-and-desist letter, warning it that selling Smithfield products to another distributor would, in its view, violate Law 75. In July, Smithfield responded that JSI is the exclusive Farmland distributor—not the exclusive Smithfield distributor—and offered it a nonexclusive distribution contract for some Smithfield products. JSI did not accept.

In December 2020, Smithfield sent JSI a notice of termination, stating that their exclusive distribution contract would terminate on February 1, 2021. But it has continued to supply JSI with Farmland and Smithfield products since then, hoping to secure a written, nonexclusive agreement. And it has made clear that JSI will be the exclusive distributor of Farmland products until those products run out. JSI is still receiving Farmland products and says that several of the dual labeled ones (*i.e.*, products labeled as both Farmland and Smithfield) are the same ones it used to receive labeled as Farmland. In other words, though the brand has changed, the substance and packaging are identical. The products' GTIN, or global identification number, have not changed either.

Smithfield has offered JSI a nonexclusive distribution contract many times. JSI has not accepted. Instead, JSI says that Smithfield forced it into such a contract. Smithfield's most recent offer included seven products, which composed around 60% of JSI's purchase volume in April 2022. But JSI has been distributing almost forty Smithfield products.

There has been more friction in JSI and Smithfield's relationship this year. In April and May 2022, for example, Smithfield and JSI exchanged a series of emails where Smithfield explained to JSI that, because it had reached its credit limit, it had placed it on credit hold and therefore would not release any products until it received payment for the overdue invoices. Once it received payment, it resumed filling JSI's purchase orders. Though JSI had made late payments before, Smithfield never complained about it until recently.

JSI's relationship with Farmland and then Smithfield has not changed throughout the years. When it wants to receive products, JSI sends a purchase order to Smithfield. If Smithfield approves the order, it sends the products to JSI's authorized agent in Jacksonville, Florida. There, JSI takes title to the products and assumes all risk. JSI's agent then ships them in an ocean freighter to Puerto Rico. When they arrive, JSI picks them up in its trucks, stores them in its facilities, and delivers them to its clients. It has a team of salesmen who sell

the products. And it also brings clients and potential clients to its facilities to see and sample them. JSI decides who it sells to, determines the price at which it sells the products, and designs its distribution plan.

Neither the exclusive distribution contract nor the nonexclusive one has set terms as to product volume, type, or price. And the volumes and types of products that JSI orders have fluctuated greatly. Moreover, JSI's purchase orders state that Smithfield should not process an order if it disagrees with JSI's offered price, quantity, freight, or pack sizes. Smithfield sometimes declines to fill JSI's purchase orders for one reason or another. There have been times, for example, when JSI has reached its credit limit or Smithfield has disagreed with the terms in JSI's purchase orders. The only consistent term has been "NET 24," meaning that payment is due twenty-four days after the invoice date. Paying on time is a part of their relationship.

JSI claims that Smithfield told it that it would stop filling its purchase orders on June 15, 2022, unless it agrees to

a written, nonexclusive distribution contract. Unless the Court issues a preliminary injunction ordering Smithfield to continue their existing unwritten, nonexclusive distribution contract, JSI argues, it will suffer irreparable harm because losing Smithfield products means not only losing sales, but also its reputation as a reliable distributor.

## II. ANALYSIS

Law 75 governs the relationship between principals and dealers. *Medina & Medina, Inc. v. Hormel Foods Corp.*, 840 F.3d 26, 41 (1st Cir. 2016) (quoting *Irvine v. Murad Skin Rsch. Labs.*, 194 F.3d 313, 317 (1st Cir. 1999)). Puerto Rico enacted it to protect dealers from principals that arbitrarily terminated their distribution contracts after the dealer had created a market for their products. *Casco, Inc. v. John Deere Constr. & Forestry Co.*, 990 F.3d 1, 8 (1st Cir. 2021) (quoting *R.W. Int'l Corp. v. Welch Food, Inc.*, 13 F.3d 478, 482 (1st Cir. 1994)); *see also R.W. Int'l Corp. v. Welch Foods, Inc.*, 88 F.3d 49, 51 (1st Cir. 1996) ("The Puerto Rico Legislature enacted Law 75 believing that traditional contract-law principles had not afforded local

dealers adequate protection from arbitrary dealer-contract terminations by larger, primarily mainland-based principals which normally enjoy a superior bargaining position."). To effectuate that goal, it "prohibits principals from engaging in conduct that, directly or indirectly, impairs—or is 'detrimental' to—the established relationship without just cause." *Medina & Medina Inc.*, 840 F.3d at 41 (quoting P.R. Laws Ann. tit. 10, § 278a). Just cause is "[n]onperformance of any of the essential [contractual] obligations" or an act that "adversely and substantially affects the [principal's] interests . . . in promoting the marketing or distribution of the [products]." P.R. Laws Ann. tit. 10, § 278(d).

The contractual obligations need not be reduced to writing. *See* P.R. Laws Ann. tit. 10, § 278(b) (defining dealer's contract, as relevant, as any "[r]elationship established between a dealer and a principal or grantor whereby and irrespectively of the manner in which the parties may call, characterize or execute such relationship, the former actually and effectively takes charge of the distribution of a [product]

. . . on the market of Puerto Rico"); *Medina & Medina, Inc.*, 840 F.3d at 47 n.16 ("It is black letter law . . . that Law 75 does not require an agreement to be in writing for its terms to have legal effect."). When there is no written contract, we look to the parties' "course of dealing to discern the terms of the agreement." *See Medina & Medina, Inc.*, 840 F.3d at 46 n.15; *see also id.* at 32 (agreeing that "the entire course of dealing . . . during the relevant time period is helpful in understanding the business relationship between the two parties, especially given the lack of a written contract").

Law 75 allows us to grant a preliminary injunction ordering the parties to continue their relationship as it exists in their distribution contract. P.R. Laws Ann. tit. 10, § 278b-1 ("[T]he court may grant . . . any provisional remedy . . . ordering any of the parties, or both, to continue, in all its terms, the relation established by the dealer's contract, and/or to abstain from performing any act or any omission in prejudice thereof."). Because this is a diversity case, Puerto Rico's substantive law applies to our preliminary injunction

analysis. *Waterproofing Sys. v. Hydro-Stop, Inc.*, 440 F.3d 24, 33 (1st Cir. 2006). Unlike the common law rule, a preliminary injunction under Law 75 does not require a showing of irreparable harm or likelihood of success on the merits. *Id.* Instead, our decision is tied to "the interests of all parties concerned and the purposes of [Law 75's] public policy." P.R. LAWS ANN. tit. 10, § 278b-1; *see also Luis Rosario, Inc. v. Amana Refrigeration*, 733 F.2d 172, 173 (1st Cir. 1984) (Breyer, J.) ("[Law 75] requires the court to look both to the parties' 'interests' and to [its] 'public policy.'"). Its public policy is to prevent principals from impairing distribution contracts without just cause. *Luis Rosario, Inc.*, 733 F.2d at 173. Although Law 75 does not require us to find irreparable harm or a likelihood of success on the merits, our thoughts on these will affect how we view the parties' interests and the question of whether an injunction would further Law 75's public policy. *See id.* ("The strength of the parties' interests also may depend upon the likelihood that 'just cause' will be found."); *id.* at 174 (stating that the district court considered irreparable harm

because it noted that the party moving for the preliminary injunction, if ultimately successful, will be compensated for any damages the nonmovant causes by continuing its business through another distributor); *see also Pan Am. Comput. Corp. v. Data Gen. Corp.*, 652 F.2d 215, 217 (1st Cir. 1981) ("[T]he court's view of the merits would certainly affect its judgment of the weight of the parties' interests and of the injunction's effect on the statutory policies.").

Having set out our guideposts, we begin our analysis. Law 75's protection is limited by the "rights acquired under the agreement regulating [the parties'] business relationship." *Medina & Medina, Inc.*, 840 F.3d at 41 (quoting *Irvine*, 194 F.3d at 318). Law 75, in other words, does not come into play unless a dealer's contractually acquired rights have been impaired. *Vulcan Tools v. Makita USA*, 23 F.3d 564, 569 (1st Cir. 1994); *see also Madelux Int'l v. Barama Co.*, 186 F. App'x 10, 11 (1st Cir. 2006) (unpublished) ("[T]he applicability of Law 75 depends . . . on proof that protected distributorship rights exist."). So as a threshold matter, we must decide whether JSI is a dealer

and whether a nonexclusive distribution contract exists between it and Smithfield. If we answer yes to both questions, then we need to determine the terms of that contract and evaluate whether Smithfield has impaired any of them. If it has, our final inquiry is whether it had just cause to do so.

To briefly recap, both parties agree that they have an exclusive distribution contract where JSI is the exclusive distributor for Farmland products. JSI contends that, for the past few years, they have also had a nonexclusive distribution contract for Smithfield products. Smithfield argues that because JSI is not a dealer, there are no discernable terms governing this alleged contract, and JSI rejected its offers to form a nonexclusive distribution contract, they have no such contract protected by Law 75.

First, JSI is a dealer. Following the Supreme Court of Puerto Rico's lead in *Roberco, Inc. v. Oxford Industries, Inc.*, 22 P.R. Offic. Trans. 111 (1988), the First Circuit has sketched out several factors to consider in deciding whether an entity is a dealer under Law 75: "promotion of the product, keeping an

inventory, fixing prices, delivery and billing responsibilities, authority to extend credit, advertising campaigns, assumption of risk, purchasing the product, maintaining facilities, and offering product-related services to clients." *Re-Ace, Inc. v. Wheeled Coach Indus., Inc.*, 363 F.3d 51, 55–56 (1st Cir. 2004) (quoting *Triangle Trading Co. v. Robroy Indus.*, 200 F.3d 1, 4–5 (1st Cir. 1999)). None of these factors are conclusive, and none have more weight than others. *Roberco, Inc.*, 22 P.R. Offic. Trans. at 123. JSI promotes Farmland and Smithfield products, keeps an inventory of them in its warehouses, fixes the price at which it sells them, delivers them to its clients, bills its clients, extends credit to its clients, has a Foodservice Sales Marketing Program agreement with Smithfield where Smithfield reimburses it a small sum for advertising costs, assumes the risk before the products enter Puerto Rico, purchases the products from Smithfield, and maintains its own facilities. Needless to say, JSI has total control over the products' distribution in Puerto Rico. *Triangle Trading Co.*, 200 F.3d at 4 ("[T]he core question is whether the

dealer obtained a certain level of control over the distribution of the supplier's products in Puerto Rico."). Thus, it has the "requisite autonomy to be a dealer under [Law 75]." *Id.*

Having determined that JSI is a dealer, we turn to discerning what rights, if any, it has acquired through its nonexclusive distribution contract with Smithfield. But we pause for a moment to note that we are skeptical that such a contract exists. For JSI has not accepted any offer to form one and the inconsistency in the parties' dealings make it more likely that each product purchase constitutes a contract. Putting that issue aside for another day and assuming that the parties have a nonexclusive distribution contract, we see no contractually acquired rights that Smithfield will impair by refusing to fill JSI's orders.

When there is no written agreement, a contract's terms must be discerned by the parties' course of dealing. The problem here is that we see no pattern or consistency in the parties' course of dealing. There is no minimum product volume that JSI must purchase. There is no minimum product

volume that Smithfield must sell. There are no circumstances under which Smithfield must fill JSI's purchase orders. Indeed, Smithfield can refuse to fill a purchase order if it disagrees with JSI's terms. JSI's product needs cannot be forecasted from Smithfield's sales-tracking software because its purchases vary so greatly. The short of it is that we see no contractually acquired *rights* at all. For JSI is not obligated to place orders and Smithfield is not obligated to fill them. Just as Law 75 cannot transform a nonexclusive distribution contract into an exclusive one, *Vulcan Tools*, 23 F.3d at 569, it cannot create an obligation to fill purchase orders where none exists. Because Law 75 only protects against impairments of contractually acquired rights, *Casco, Inc.*, 990 F.3d at 8, and JSI has no such right to have its purchase orders filled, Smithfield would not impair their contract by deciding not to fill JSI's purchase orders.

Even if we had agreed that Smithfield is contractually obligated to fill JSI's purchase orders, Smithfield would have just cause for impairing their contract by refusing to fill them.

To be sure, Law 75 creates a rebuttable presumption of impairment when the principal, among other things, "unjustifiably fails to fill an order." *Id.* (citing P.R. LAWS ANN. tit. 10, § 278a-1(b)(3)). But even if Smithfield would impair the contract by refusing to fill JSI's orders, it would have just cause to do so. Generally, "paying for goods on time . . . is one of the essential obligations" of the contract and thus failing to pay on time constitutes just cause to impair the contract. *Waterproofing Sys.*, 440 F.3d at 29. There is, however, a narrow exception to this rule in the unusual case "where 'a supplier does not care about late payments.'" *Id.* (quoting *PPM Chem. Corp. of P.R. v. Saskatoon Chem. Ltd.*, 931 F.2d 138, 139 (1st Cir. 1991)). Smithfield has a history of tolerating late payments, but it recently refused to fill orders until JSI made payments on its overdue invoices. Though there appears to be a genuine factual issue about whether timely payment was an "essential" obligation of their contract, we think it more likely that it is because Smithfield, without objection from JSI, has at times refused to fill JSI's orders until it paid overdue invoices.

So Smithfield does care about timely payment. Moreover, JSI said that paying on time is part of their relationship.

Smithfield would also have just cause to impair the nonexclusive distribution contract on the ground that it has reached a *bone fide* impasse in its negotiations with JSI. For JSI has not accepted its offers for a written, nonexclusive distribution contract. In response to a certified question from the First Circuit, the Supreme Court of Puerto Rico stated that Act 75 "does not bar the principal from totally withdrawing from the Puerto Rican market when his action is not aimed at reaping the good will or clientele established by the dealer, and when such withdrawal . . . is due to the fact that the parties have bargained in good faith but have not been able to reach an agreement as to price, credit, or some other essential element of the dealership." *Medina & Medina v. Country Pride Foods*, 858 F.2d 817, 824 (1st Cir. 1988) (certified translation). The First Circuit has intimated that this rule also applies where the principal does not intend to withdraw from Puerto Rico's market. *R.W. Int'l Corp.*, 13 F.3d at 484 n.4 (stating "we

believe the principle underlying *Medina & Medina* is equally applicable in these circumstances, i.e., that a supplier has just cause to terminate if it has bargained in good faith but has not been able 'to reach an agreement as to price, credit, or some other essential element of the dealership'" even if "there is no indication that [the supplier] intended to leave the market" (quoting *Medina & Medina*, 858 F.2d at 824)). We have seen no evidence that Smithfield's decisions to consolidate its brands, do away with Farmland, and offer JSI a written, nonexclusive distribution contract are unreasonable or in bad faith. It consolidated its brands to eliminate redundancies and its most recent offer to JSI, while far fewer products than it currently distributes, includes exclusive distribution rights to a portfolio of products that compose a reasonable amount of its purchase volume. The parties' core dispute concerns brand exclusivity, which is an essential term of the proposed contract. Because Smithfield's offer appears to be reasonable notwithstanding that its not the offer JSI wants, it has just

cause to impair their contract on the ground that they have reached a *bone fide* impasse in negotiations.

We briefly recount the ground that we have covered. JSI is a dealer. But even if it has a nonexclusive distribution contract with Smithfield, Smithfield will not impair that contract by refusing to fill JSI's orders because it is not contractually obligated to fill them. And even if it would impair that contract by refusing to fill JSI's orders, it would have just cause to do so for two independent reasons: JSI has violated an essential term of their contract by making late payments and the parties have reached a *bona fide* impasse in their negotiations for a nonexclusive distribution contract.

We turn now to the harm JSI might experience absent an injunction requiring Smithfield to continue their nonexclusive distribution contract. JSI is the largest foodservice distributor in Puerto Rico. Last year, its estimated volume of business totaled $300 million dollars. If Smithfield does not fill its orders, it says that it will lose sales and its reputation as a reliable supplier will suffer. We agree that

those harms will likely befall it without an injunction. But we also note that its total annual sales of Farmland and Smithfield products last year was about $13 million. So losing its Farmland and Smithfield products is not a substantial hit.

Neither the parties' interests nor Law 75's public policy would be served by issuing a preliminary injunction here. Though JSI is a dealer and will likely experience some irreparable harm to its reputation without an injunction, the merits weigh heavily in favor of Smithfield. To be sure, JSI has an interest in being able to continue supplying its clients with Farmland and Smithfield products. But Smithfield has an interest in the freedom to choose whether it fills JSI's purchase orders (a freedom, we note, it enjoys under their current arrangement) rather than being compelled to do so. Assuming a nonexclusive distribution contract exists, JSI has no contractually acquired right to have its orders filled. Thus, an injunction requiring Smithfield to fill JSI's orders would not further Law 75's policy in promoting "the strict adherence to the provisions of [dealer's contracts]." *Waterproofing Sys.*,

440 F.3d at 33. And even if JSI has such a right, Smithfield has just cause for impairing it on two independent grounds. So Law 75's policy of protecting dealers from principals impairing their contracts *without just cause* would not be furthered by an injunction either.

### III. CONCLUSION

In sum, because both the parties' interests and Law 75's public policy weigh against a preliminary injunction, the Court **DENIES** JSI's motion for one (Docket No. 2).

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 15th day of June 2022.

S/ SILVIA CARREÑO-COLL
UNITED STATES DISTRICT COURT JUDGE